UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | 3:10-cr-00091 JWS |
| vs. | ) ) | ORDER AND OPINION |
| SABIL MUJAHID, | ) ) | [Re: Motion at Docket 21] |
| Defendant. | ) ) | |

## I. MOTION PRESENTED

At docket 21, defendant Sabil Mujahid moves for an alternative jury selection process. The United States of America opposes the motion at docket 42. Oral argument was not requested and would not assist the court.

## II. BACKGROUND

Mujahid is a federal prisoner at the Anchorage Correctional Complex. He is serving a prison sentence for possession of a firearm as a felon. In the case at bar, Mujahid has been accused of multiple counts of sexual abuse, aggravated sexual abuse, and abusive sexual contact perpetrated on other inmates.

In his last trial in this court, Mujahid also moved for a mistrial based on an alleged denial of his Sixth Amendment right to a jury pool representing a fair cross-section of the community, a corresponding denial of his Fifth Amendment right to equal protection

of the laws, and a violation of the Jury Selection and Service Act of 1968 ("JSSA").[1] In 2002, the District of Alaska adopted the current *Plan for Random Selection of Grand and Petit Jurors*. The plan calls for random selection of the jury pool from State of Alaska voter registration lists. It divides the district into five geographic divisions, corresponding to cities in which the court sits. State election districts provide the boundaries of each division. The relevant division for purposes of this motion is the Anchorage Division, which includes the Anchorage, Kenai Peninsula, Matanuska-Susitna, Aleutian East, Aleutian West, Dillingham, and Lake & Peninsula Boroughs, as well as communities outside those boroughs such as Cordova in the East and Bethel in the West. Mujahid previously argued that voter registration lists should be supplemented in order to ensure representation of a fair cross-section of the Anchorage Division. Mujahid's motion for a mistrial was denied, and he was ultimately sentenced to ten years imprisonment.[2]

In the present motion, Mr. Mujahid raises similar arguments regarding the constitutionality of the District of Alaska's jury selection plan. Mujahid seeks implementation of a new plan or supplementary measures before trial.

### III. DISCUSSION

**A. Sixth Amendment**

Mujahid argues that the District of Alaska's jury selection plan violates the fair cross-section requirement of the Sixth Amendment. To establish a prima facie violation, a defendant must show

> (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of

---

[1] 28 U.S.C. §§ 1861–69; *see* Memorandum of Points and Authorities in Support of Mr. Mujahid's Renewed Motion for Mistrial, *United States v. Mujahid*, No. 3:09-cr-00034 (D. Alaska Aug. 27, 2009), doc. 73.

[2] Order Re: Motion at Docket No. 73, *United States v. Mujahid*, No. 3:09-cr-00034 (D. Alaska Dec. 22, 2009), doc. 94; Judgment, *United States v. Mujahid*, No. 3:09-cr-00034 (D. Alaska Mar. 26, 2010), doc. 108.

-2-

such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.[3]

The first element is not disputed. Mujahid is African-American, and African-Americans constitute a distinct class.[4]

To satisfy the second element, Mujahid relies on the data he used to support his motion for mistrial in the previous case.[5] That data indicates that since 2001, African-Americans have made up an average of 2.06% of master jury wheels in the District of Alaska.[6] African-Americans make up 5.2% of the total population in the Anchorage Division.[7] The absolute disparity is therefore 3.14%.[8] Absolute disparities of 7.7% or lower are insufficient to establish underrepresentation in the Ninth Circuit.[9] Mujahid has therefore failed to satisfy the second prong of the Sixth Amendment inquiry.

Mujahid argues that comparative disparity–the percentage obtained from dividing the absolute disparity by the group's percentage of the total population–is a better measure of underrepresentation "when members of a distinctive group compose only a small percentage of those eligible for jury service."[10] Here, the comparative disparity is 60%–3.14% divided by 5.2%. This means that, on average, 60% of eligible African-American jurors have been excluded from master jury wheels since 2001. While this

---

[3] *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

[4] *E.g.*, *United States v. Cannady*, 54 F.3d 544, 547 (9th Cir. 1995).

[5] *See* Order Re: Motion at Docket No. 73, *United States v. Mujahid*, No. 3:09-cr-00034 (D. Alaska Dec. 22, 2009), doc. 94.

[6] *See id.* at 4 tbl. 2.

[7] *Id.* at 6 tbl. 5.

[8] "Absolute disparity" is "the difference between the percentage of the distinctive group in the community and the percentage of that group in the jury pool–[it is] the appropriate measure of the representativeness of the jury pool" when undertaking an equal protection or fair cross-section inquiry. *United States v. Rodriguez-Lara*, 421 F.3d 932, 943 (9th Cir. 2005).

[9] *United States v. Suttiswad*, 696 F.2d 645, 649 (9th Cir. 1983).

[10] Doc. 21 at 5; *see Smith v. Berghuis*, 543 F.3d 326 (6th Cir. 2008), *rev'd on other grounds*, 130 S. Ct. 1382 (2010).

number is troubling, "[t]he comparative disparity method can distort the effect of disparities in representation when absolute numbers are low."[11] Such is the case here: African-Americans make up a relatively small percentage of the population in the Anchorage Division, and the absolute disparity in their representation in jury pools is low. Consequently, the comparative disparity measure is misleading. Whatever the appeal of Mujahid's argument, Ninth Circuit "case law has settled on absolute disparity . . . as the appropriate measure of the representativeness of the jury pool."[12] Accordingly, Mujahid has not established a prima facie Sixth Amendment violation.

**B. Jury Selection and Service Act of 1968**

Mujahid argues that the District of Alaska's jury selection plan violates the JSSA. Even though "[t]he test for a constitutionally selected jury is the same whether challenged under the Sixth Amendment . . . or under the [JSSA]," Mujahid's contention is slightly different and therefore requires independent analysis.[13]

The JSSA explicitly contemplates the use of voter registration lists to source juries.[14] A jury selection plan must also, however, "prescribe some other source or sources of names in addition to voter lists" if necessary to ensure that a fair cross-section of the community is represented or that potential jurors are not excluded on the basis of race.[15] Mujahid argues that the District of Alaska's plan offers no such prescription and that relevant data indicates that the percentage of African-Americans in the general population deviates substantially from the percentage of African-Americans in the venire. Mujahid cites only legislative history to support his contention that "any

---

[11] *Rodriguez-Lara*, 421 F.3d at 944 n.10.

[12] *Id.* at 943 (internal quotations omitted).

[13] *United States v. Sanchez-Lopez*, 879 F.2d 541, 546 (9th Cir. 1989).

[14] *E.g.,* 28 U.S.C. § 1863(b)(2).

[15] *Id.*; *see also Rodriguez-Lara*, 421 F.3d at 937.

substantial percentage deviations must be corrected by the use of supplemental sources."[16]

Even if the court were to accept that substantial deviation mandates supplementation of voter lists under the JSSA, Mujahid has not demonstrated that the deviation in the present case is substantial. The alleged deviation in the Anchorage Division is 3.14%.[17] A deviation of approximately 3% is not substantial. First, as discussed above, the Ninth Circuit has "declined to find underrepresentation of a distinctive group where the absolute disparity [is] 7.7% or lower."[18] Second, as the government points out in its response, out of 60 prospective jurors on a panel, one would expect either three African-Americans (based on the percentage of African-Americans in the Anchorage Division) or one African-American (based on the self-reported percentage of African-Americans in Anchorage Division jury panels). Mujahid has not demonstrated that remedying the disparity would overcome statistical variance given that the draw is random. In other words, even if the jury pool was drawn from *all* eligible members of the population, it is highly unlikely that the draw would be altered substantially because the deviation and raw numbers are small. In the absence of substantial deviation, even by Mujahid's measure, the JSSA does not require voter registration lists to be supplemented in the Anchorage Division.

## C. Fifth Amendment

Mujahid argues that the jury selection plan violates the equal protection component of the Fifth Amendment.[19] In order to make out an equal protection violation in jury selection, a "defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he

---

[16]H.R. Rep. No. 1076, at 3 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1792, 1794.

[17]This is the "absolute disparity" discussed in section III.A.

[18]*Rodriguez-Lara*, 421 F.3d at 943–44.

[19]*See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

-5-

belongs."[20] The elements of this showing are: (1) "the group is . . . a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied"; (2) "the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as . . . jurors, over a significant period of time"; and (3) "a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing."[21] "Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose and the burden shifts to the State to rebut that case."[22] Both parties treat discriminatory intent as a separate element.[23] But, it is clear that the above-listed "elements, if shown, raise the inference of discriminatory intent."[24]

As above, the first element is not at issue. Also as above, Mujahid's statistical showing–an absolute disparity of 3.14%–does not demonstrate substantial underrepresentation.[25] Even if the numerical figures did indicate substantial underrepresentation, Mujahid has not satisfied the third prong. The District of Alaska's reliance on voter registration lists is not susceptible of abuse and is racially neutral on its face. Consequently, Mujahid has not supported a presumption of discriminatory intent.

---

[20]*Castaneda v. Partida*, 430 U.S. 482, 494 (1977).

[21]*Id.*

[22]*Id.* at 495.

[23]*E.g.*, *United States v. Esquivel*, 88 F.3d 722, 725 (9th Cir. 1996) (listing "discriminatory intent" in place of the third element of the *Castaneda* test).

[24]*United States v. Rodriguez-Lara*, 421 F.3d 932, 940 (9th Cir. 2005). "Indeed, the substantial underrepresentation or the complete exclusion of an identifiable group, coupled with a juror selection procedure susceptible of abuse, has been held to establish a prima facie case in cases where intentional discrimination could not otherwise be demonstrated." *Hirst v. Gertzen*, 676 F.2d 1251 (9th Cir. 1982).

[25]*Cf. United States v. Suttiswad*, 696 F.2d 645, 649 (9th Cir. 1983).

Mujahid argues that reliance on voter registration lists when a more representative source is "readily available" is evidence of actual discriminatory intent.[26] Mujahid maintains that the Alaska court system's use of the Permanent Fund Dividend program "is a model of inclusiveness and representativeness."[27] Assuming that the list of Alaskans receiving Permanent Fund checks is a more inclusive source, the District of Alaska's reliance on voter registration lists is not direct evidence of discriminatory intent. At most, it would support an inference of discriminatory intent. The Supreme Court set out the criteria justifying an inference of discriminatory intent in jury selection processes in the third prong of the *Castaneda* test, which Mujahid has not satisfied.[28]

**D. Jury Trial Improvement Committee Recommendations**

Mujahid's final argument is that the jury selection plan does not conform to recommendations made by the Ninth Circuit Jury Trial Improvement Committee.[29] Those recommendations are not a source of positive law and are not grounds for altering the jury selection procedure in this case.

## V. CONCLUSION

For the foregoing reasons, Mujahid's motion at docket 21 for a different jury selection process is **DENIED**.

DATED at Anchorage, Alaska, this 3rd day of December 2010.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[26] Doc. 21 at 11.

[27] *Id.*

[28] *Castaneda*, 430 U.S. at 494–95.

[29] *See generally* Ninth Circuit Jury Trial Improvement Committee, *First Report on Goals and Recommendations* (2004).

-7-

Case 3:10-cr-00091-HRH   Document 64   Filed 12/03/10   Page 7 of 7